This was an action of covenant brought upon a sealed instrument for the payment and delivery of horses, six months after the date. The day of payment and delivery fell upon Sunday, and the defendant pleaded a tender and refusal on the day following, to wit; on Monday; to which plea, the plaintiff demurred. The question is, was the tender a good one in law to discharge the obligation; all other requisites to constitute it a good tender being admitted, the time only being excepted to.
The tender not being made at the time agreed upon by the parties, will not excuse the breach of stipulation secured by the covenant in general cases; and therefore, it was argued, that Sunday not being a day for the transaction of worldly business, the day next following, or the day next preceding, must in law be deemed the day for the performance of the covenant, and consequently the plea exhibited facts amounting to a specific defence against the plaintiff’s action.
In the decision of this question, it will first be necessary to examine, whether the act covenanted to be done, could be legally performed on the Sabbath day or not, for if it could, then the plea is no answer to the plaintiff’s action, the act not being done pursuant to the stipulation; if it could not be legally performed, then only might it be necessary to enquire, whether this stipulation being in itself illegal, could be enforced at all; and if it could, then whether the day next preceding, or the day next subsequent, is the legal day for the execution of it.
It is correct as was advanced by the defendant’s counsel,that no worldlylabour or business,ought tobe carried on, on the Sabbath day. It is at the least unseemly, subversive of good morals, and as it appears to me, not in- *32 unison with the principles of our holy religion. But* however reprehensible such conduct may be in the general estimation, however injurious to the social state, by inducing a laxity of manners, and thereby lessening the weight of religious obligation; yet, the only question in this court can be, could this payment and delivery of horses from the facts appearing on this record, be legally made on the Sabbath day by the defendant to the plaintiff?
In stipport of the negative of this proposition, the maxim, dies dominus non est dies jurídica, was cited and relied upon. And it was inferred that from the spirit of this rule of the common law, the payment and delivery of the horses on Sunday, were within its prohibition. The application of that maxim upon the present occasion, would be giving it much too wide a field of operation. It is property applicable to the ordinary proceedings of courts of justice. Lord Mansfield in the case of Swann vs. Swoome has given a history of the law on the point. He says, that anciently courts of justice did sit on Sundays; the ancient Christians using all times alike. This was for two reasons, first in opposition to the Heathens, who were superstitious about the observance of days and times, conceiving some to be lucky and others to be unlucky. — ■ Secondly, to prevent Christian suitors from resorting to the Heathen courts. But three canons were made, one in the year 517, another in 895, and a third in 932, prohibiting the holding pleas and adjudging causes on the Lord’s day. These canons were received and adopted by the Saxon Kings, were confirmed by William the Conqueror, and Henry the second, and so became part of the common law of England. But I find it no where stated, that ever a canon was adopted prohibiting common labor, or other usual worldly business on Sunday. Lord Mansfield in the case above cited observes, that fairs, markets, sports and pastimes were not unlawful to be holden and used on Sunday at common law, and therefore it was requisite to enact particular statutes to prohibit the use and exercise of them upon Sundays, as there was nothing else *33 that could hinder their being continued in üse. It is true that my Lord Coke, in his comment on the statute of Westminster the first, says, that there be dies juridici and dies non juridici^ that dies non juridici are dies Domi-ni, and that this was the ancient law of England, and extended not only to legal proceedings, but to contracts, 2 Inst. 264. The adjudged cases are, however, the other way: and even he himself, in Macalley’s case, decided, that the arrest which was made on Sunday was good, and urged that dies Dominicus est dies juridicus, 9 Rep. 66; Cro. Jac. 279. The case of Comyns vs. Bayer, Cro. Eliz. 425, places this matter in a clear light. The defendant pleaded a sale in an open fair, but in stating the right to hold the fair, he did not except the case of the fair day falling on a Sunday, and it was urged that the plea was bad, because a fair held on Sunday, by 27 Hen. VI. ch. 9, would be illegal. The court determined that the holding a fair on that day would be illegal,being contrary to the provisions of this statute; but that the contract would not be void. Since this case has been adjudged; the law has been changed; and it is now held, that if an act is forbidden under a penalty, a contract to do it is void. This case shows that there was nothing in the common law that would avoid a sale made on Sunday; otherwise it would have been unnecessary to have men¿ tioned this statute of Hen. VI., to show the illegality, if the act of sale on Sunday had been considered void, independent of it. In Waite vs. the Hundred of Stoke, Cro. Jac. 496, the legality of travelling on a Sunday is recognized; and it is laid down, that an arrest on Sunday, and other ministerial acts are good, and that an original writ or patent bearing teste on Sunday, is good enough: for the Chancellor may seal writs or patents on any day. Thus an estate or title may be granted on Sunday. In the King vs. Brotherton, 1 Str. 702, an indictment at common law, not concluding contra formant statuti, for selling meat on a Sunday, was held bad on demurrer. These adjudged cases prove, that at the common law, acts not expressly prohibited might be done on *34 a Sunday; and that contracts made, work and labor done, and even business of one’s ordinary calling, followed on that day, were not, on that account, ever considered by it as illegal.
This brings us to our act of 1741, ch. 14, sec. 2. It says, “that all and every person and persons whatsoever, shall on the Lord’s day, commonly called Sunday, carefully apply themselves to the duties of religion and piety, and that no tradesman, artificer, planter, laborer, or other person whatsoever, shall, upon the land or water, do or exercise any labor, business or work of their ordinary callings, (works of necessity and charity only excepted,) nor employ themselves in hunting, &c. nor use any game, sport or play, on the Lord’s day aforesaid upon pain &c. to forfeit ten shillings, &c.”
The professed object of this statutp, was to further the observance of the Sabbath day, pursuant to the spirit of its original institution. This object is fully and forcibly expressed in its words, “that all persons whatsoever shall apply themselves to the duties of religion and piety;” and certainly the .actions disclosed upon this record, comport not with its injunction, but are directly contrary to the tenor of conduct contemplated by it. It would, therefore, seem to have been the intention of the framers of this statute, to have totally interdicted all worldly labor whatsoever. Yet the rules of construction adopted, and constantly adhered to by the courts, in the case of penal statutes, will narrow down this intention so far, as not to render all acts illegal and void, it having been decided, that to do so, there must be an express prohibitory clause. Now, in our act, the express prohibition is against work and labor of one’s ordinary calling and extends not to all kinds of labor indiscriminately, under any circumstances.
The case of Drury vs. Defontaine, in Taunton’s Reports, shews the construction of the English judges upon' their statute of 29 Ch. II ch. 7; an act similar to ours, having substantially the same enactment, and in nearly the same words. The facts of that case, as far as they are necessary to be stated here, are these: The plaintiff, *35 a Banker by trade, sent his horse to Hull, who kept a commission stable for the sale of horses by auction, for the purpose of being sold; the defendant came on a Sunday to the stable, tried the horse, and had leave from Hull to take him of! for another to try him, to "be returned by two o’clock, or the horse to be the defendant’s at £100. The horse was not returned till 8 o’clock, when Hull refused to receive him, and an action was brought for the £100. Defence — the contract made on Sunday. The court said, that it does not appear that ever the common law considered contracts made on a Sunday void; and the statute of Charles enacts, “that no person whatsoever shall do or exercise any wordly labor, business, or work of their ordinary callings, on the Lord’s day.” To bring the case within the act, we must pronounce that either Drury or Hull, worked within their ordinary callings on the Lord’s day; but the sale of horses, by private contract, was not Drury’s ordinary calling, nor was it Hull’s: therefore the sale must be held good.
So in the case before-the court, there is nothing to show, that the work and labor, and business stated in the record, was of the ordinary calling of either of $ie parties, but in the nature of the transaction, quite the reverse — a private matter. However much, therefore, it is to be regretted, yet the act covenanted to be done on Sunday, might have been lawfully performed on that day, and not being done, the plea is no answer to excuse the non-performance. Demurrer sustained.